**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————————

MAURICIO CLAROS, DAMARIS MUNOZ,
NELSON MUNOZ, CRISTIAN MUNOZ, and
MAURO CLAROS,                                              1:24-cv-1197
                                                           (ECC/PJE)

                                    Plaintiffs,

v.

MARVIN'S REFRIGERATION CORP.,
MARVIN TREJOS and GRELY MORENO
GONZALEZ,

                                    Defendants.

———————————————————————

Maureen Hussain, Esq., *for Plaintiffs*
Regina E. Faul, Esq., *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

Mauricio Claros, Damaris Munoz, and their sons Nelson Munoz, Cristian Munoz, and

Mauro Claros (Plaintiffs) brought this action against Marvin's Refrigeration Corp. (Marvin's),

Marvin Trejos, and Grely Moreno Gonzalez (Defendants) alleging claims under the Fair Labor

Standards Act, 29 U.S.C. §§ 201, *et seq*., the civil remedies portion of the Trafficking Victims

Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595(a), and New York law.   After

Defendants filed a motion to dismiss, Dkt. No. 13, Plaintiffs filed an Amended Complaint, Dkt.

No. 17.   Presently before the Court is Defendants' motion to dismiss the Amended Complaint

under Fed. R. Civ. P. 12(b)(6).   Dkt. No. 27.   The motion is fully briefed.   Dkt. Nos. 27-1, 29, 30.

For the following reasons, Defendants' motion is granted in part and denied in part.

I.      **FACTS**[1]

Marvin's is a "domestic corporation that provides commercial and residential refrigeration sales and services including repair, maintenance, and installation of new and used appliances." Amended Complaint (AC) ¶ 20 , Dkt. No. 17.  Trejos is the "owner and principal" of  Marvin's. *Id.* at ¶ 22.  Moreno Gonzalez is "an owner and manager" of Marvin's.  *Id.* at ¶ 29.  Plaintiffs are all Spanish speakers and are not fluent in English.  *Id.* at ¶ 15.  When Plaintiffs arrived in February 2022, Trejos "informed them that they owed him over $20,000," and Plaintiffs "needed to repay as soon as possible."  *Id.* at ¶ 2.  Plaintiffs began working for Defendants "shortly after arriving in Kerhonkson."  *Id.* at ¶ 39.

In 2021, Defendants recruited Plaintiffs to work at Marvin's and arranged Plaintiffs' travel from outside the U.S. to Kerhonkson, New York.  AC ¶ 2, Dkt. No. 17.  While working for Defendants, Plaintiffs lived in Trejos and Moreno Gonzalez's house in rural Kerhonkson in two rooms that Plaintiffs shared with another family member.  *Id.* at ¶¶ 3, 41, 80.  Several co-workers also lived there.  *Id.* at ¶ 3.  Marvin's warehouse and repair shop was at the same location as the house.  *Id.*  The Plaintiffs "depended on" Defendants for "permission" to leave the property because they "relied on Defendants' vehicles," given the rural location of the house.  *Id.* at ¶ 84. When Plaintiffs worked off-site, they began their days at the house, *id.* at ¶ 43, and had to return the company vehicles to the Kerhonkson garage when they finished their work, *id.* at ¶ 44.

Plaintiffs worked "from morning until night, usually at least six days a week, doing a range of tasks including refurbishing used refrigeration panels and other materials," "making deliveries

---

[1] These facts are drawn from the Amended Complaint.  The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

and performing installations of appliances in multiple states, and performing domestic labor for Defendants." *Id.* at ¶ 3. They "typically worked over 65 hours per week." *Id.* at ¶ 5.

Trejos and Moreno Gonzalez "constantly surveilled" Plaintiffs by cameras when they were at the house in Kerhonkson, and by a phone application when they traveled. AC ¶ 4. They also required Plaintiffs to send picture and video updates about their work "multiple times each day," and sent "frequent[] call[s] or text[s]," if Plaintiffs did not update them when they wanted or "if they detected that Plaintiffs had taken a different route to a customer location." *Id.* at ¶ 73.

Trejos "regularly made comments" to Plaintiffs regarding how "difficult life would be for them elsewhere because of their lack of English skills," even claiming that "there were 'no job opportunities' in the city and that they would not get very far." AC ¶ 89. When Plaintiffs "expressed to Defendants a desire for freedom, Defendants repeatedly denied them the opportunity to seek alternative employment or educational opportunities." *Id.* at ¶ 90. "On several occasions," Trejos "boasted about his legal team to Plaintiffs," and referred to "legal action" taken against former employees to make them and those who had "double crossed him 'pay.'" *Id.* at ¶ 94. Plaintiffs understood these comments as warnings. *Id.*

At first, when Defendants paid Plaintiffs, "they required Plaintiffs to return some of their wages to them as payment for the 'debt' and for other purported expenses, including rent, electricity, food, phones that were used for work, vehicle use, and gas." AC ¶ 70. "Shortly thereafter, however," Moreno Gonzalez and Marvin's "imposed unauthorized deductions from wages, including for purported debt, rent, electricity, food, phones that were used for work, vehicle use, and gas." *Id.* at ¶ 71. Plaintiffs "lacked the details necessary to understand their pay rate," "track their hours," or ultimately account for these deductions, leaving them unable to "understand their purported 'debt.'" *Id.* at ¶ 78. This left Plaintiffs with "with varying amounts of wages, but

generally less than $100 per week each." *Id.* at ¶ 72. These "wages were insufficient to cover other basic living expenses, leaving Plaintiffs in a state of chronic financial instability." *Id.* at ¶ 83. When Nelson Munoz told Trejos and Gonzales that he wanted to move to live on his own, Trejos told him that "he could not leave until he finished working for Defendants." *Id.* at ¶ 91. Nelson Munoz understood this to mean that "he had to finish paying off his 'debt' before he could move out or stop working." *Id.* This conversation occurred "multiple times." *Id.*

As a result of their working conditions, Plaintiffs "experienced psychological harm," "feeling anxious and depressed." AC ¶ 96.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

III.    **DISCUSSION**

A.    **Group Pleading**

Defendants argue that the Amended Complaint should be dismissed because it uses impermissible group pleading.  Defendants' Memorandum of Law (Def. Mem.) at 13–15, Dkt. No. 27-1.[2]  Specifically, Defendants contend that "Plaintiffs' allegations fail to specify which of the Defendants . . . engaged in various alleged violative actions," and therefore the Amended Complaint does not provide "a short and plain statement of the claim showing that the pleader is entitled to relief" as required by Fed. R. Civ. P. 8(a).  Def. Mem. at 14, 15.  Plaintiffs respond that the Amended Complaint provides adequate notice and that references to actions taken by "Defendants" reflect that the Defendants and the claims are closely related.   Plaintiffs' Memorandum of Law (Pl. Mem.) at 4–7.

The group pleading doctrine, "historically confined to fraud cases," requires that "a complaint alleging fraud committed by multiple defendants . . . inform each defendant of the nature of his alleged participation in the fraud."  *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 117 (2d Cir. 2023) (quotations omitted).  "'Although Fed. R. Civ. P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests.'"  *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 438 (S.D.N.Y. 2019) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order)).  When a complaint is "detailed enough to enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the

---

[2] Unless otherwise noted citations to page numbers refer to pagination generated by the ECF system.

proper form of trial," the complaint satisfies Fed. R. Civ. P. 8 "even if it includes certain allegations against 'Defendants' collectively." *Goetz v. Ainsworth Pet Nutrition, LLC*, 768 F. Supp. 3d 645, 652 (S.D.N.Y. 2025) (cleaned up).

Here, the Amended Complaint satisfies Rule 8.  Defendants—a corporation, the owner-principal of that corporation, and an owner-manager of the corporation—are a small group of closely related persons, while the cases cited by Defendants involve far more defendants who are not so closely related, and could not have been acting jointly.  *See, e.g., Nesbeth v. New York City Mgmt. LLC,* No. 17-cv-8650, 2019 WL 110953, at *1 (S.D.N.Y. Jan. 4, 2019) (applying doctrine to 21 defendants in four groups where the groups were not as closely related as the Defendants here).  In addition, the allegations that Defendants point to in the Amended Complaint plausibly appear to refer to joint actions.  *See* Def. Mem. at 14–15 (referring to AC ¶¶ 2, 5, 78, 82, 85, 88, 90).  Moreover, the Amended Complaint is coherent and relatively short, unlike the 45-page complaint with "little coherence" in *Nesbeth*.  2019 WL 110953 at *2.  Finally, the references to "Defendants" in the Amended Complaint do not prevent (1) Defendants from answering, (2) the application of claim preclusion, and (3) the identification of the nature of this case.  The Amended Complaint will therefore not be dismissed for group pleading.

### B.    Trafficking Victims Protection Reauthorization Act Claims

The TVPRA[3] provides that "[a]n individual who is a victim of [18 U.S.C. §§1581 through

---

[3] The Amended Complaint refers to the Trafficking Victims Protection Act (TVPA).  AC at ¶ 97, The TVPA, enacted in 2000, provides the criminal penalties in 18 U.S.C. §§ 1589 and 1590, but it is the 2003 TVPRA that creates a civil cause of action for violations of these statutes (and a 2008 amendment for violations of 18 U.S.C. §§ 1581 and 1584).  *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 658 n.6 (S.D.N.Y. 2024); *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012); Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108–193, § 4(a)(4), 117 Stat. 2875, 2877 (2003); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, § 221, 122 Stat. 5044, 5067 (2008).  The TVPRA is therefore the source of Plaintiffs' claims, not the TVPA.

1597] may bring a civil action against the perpetrator . . . in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."  18 U.S.C. § 1595(a).

### 1.    Forced Labor in Violation of 18 U.S.C. § 1589

Plaintiffs claim that Defendants obtained their forced labor in violation 18 U.S.C. §§ 1589(a)(2) and 1589(a)(4) "by means of serious harm and threats of serious harm," and by using "a scheme, plan, or pattern intended to cause Plaintiffs to believe that, if they did not perform such labor, they and their family would suffer severe financial harm," "including the loss of financial wherewithal to obtain basic necessities."  AC ¶¶ 102, 103.  Defendants argue that Plaintiffs have not adequately alleged "serious" harm as required for a § 1589 forced labor claim, and that they have not sufficiently alleged that Defendants had the requisite scienter for a § 1589 claim.  Def. Mem. at 7–9.  Plaintiffs respond, among other arguments, that they have made out a forced labor claim through their allegations of isolation and lack of local knowledge combined with the $20,000 debt scheme and Trejos's veiled threats.  Pl. Mem. at 12–17.

Section 1589(a) in relevant part prohibits "knowingly . . . obtain[ing] the labor or services of a person by . . . (2) by means of . . . threats of serious harm to that person or another person . . . or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm."  Serious harm is defined in § 1589(c)(2) as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  To satisfy the statute's scienter requirement, there must be evidence that the employer "knowingly or intentionally . . . threatened" to harm the victim, with threats that would "'compel a reasonable person in [the victim'] position to remain in [the employer's] employ, against [their]

will . . . in order to avoid such threats of harm, when [they] otherwise would have left.'" *United States v. Zhong*, 26 F.4th 536, 561 (2d Cir. 2022) (quoting *Muchira v. Al-Rawaf*, 850 F.3d 605, 620 (4th Cir. 2017). "When considering whether an employer's conduct was sufficiently serious to coerce the victim to provide labor or services against her will," courts "consider the particular vulnerabilities of a person in the victim's position," but "[t]he correct standard is a hybrid" because it "also requires that the victim's 'acquiescence be *objectively reasonable* under the circumstances." *Muchira*, 850 F.3d at 618 (quoting *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015).

As a result, forced labor cases "[t]ypically involve" certain hallmarks, "such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language." *Muchira*, 850 F.3d at 618–19 (collecting cases). Regarding threats of legal action, a district court in this Circuit has concluded that an employer's threats to apply an unenforceable $25,000 liquidated damages clause against "recent immigrants" who were nurses met the serious harm standard for a § 1589(a)(2) claim. *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at *18 (E.D.N.Y. Sept. 24, 2019), *aff'd in part, appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020).

Here, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor, they have alleged a claim for forced labor under both §§ 1589(a)(2) and 1589(a)(4). Defendants isolated Plaintiffs, who were not fluent in English, by controlling their movement and their contact with others, requiring them to live in cramped conditions at their work site, and monitoring them constantly. In addition, given the brief time between when they arrived

in the United States and when they began working, it could be a fair inference that Plaintiffs were not familiar with the American legal system and that lack of familiarity—combined with the undefined nature of their debt—could support an inference that Trejos's repeated threats to make them "pay" would be particularly coercive. Moreover, the size of the debt and the implied threat to enforce it is comparable to the liquidated damages clause found to be coercive in *Paguirigan* against similarly situated, recently immigrated Plaintiffs. Defendants also leveraged the debt by repeatedly telling Plaintiffs that they could only earn money by continuing to work at Marvins, enhancing the coercive effect of the debt threat. Finally, the length of time that Plaintiffs tolerated these conditions could support a reasonable inference that Defendants knowingly and intentionally used their threats to obtain Plaintiffs' continued labor.

Accordingly, the Amended Complaint sufficiently alleges that Defendants obtained Plaintiffs' labor through threats of serious financial harm, that they did so knowingly, and that they intended to use a pattern of threats to cause the Plaintiffs to believe that they would suffer serious financial harm if they did not continue working for Defendants.

The Amended Complaint therefore states a claim for forced labor against all Defendants as to all Plaintiffs, and Defendants' motion is denied as to as to this basis of the TVPRA claim.

### 2.    Involuntary Servitude in Violation of 18 U.S.C. § 1584

Plaintiffs also claim that Defendants violated the prohibition against involuntary servitude in 18 U.S.C. § 1584 "by orchestrating their financial dependence on and debt to Defendants, doling out their earned wages in an unpredictable piecemeal manner, restricting their freedom of movement, and isolating them from alternative means of securing a livelihood." AC ¶ 101. Defendants argue that Plaintiffs did not allege threatened physical violence or legal coercion necessary to make out an involuntary servitude claim as explained by the Supreme Court in *United States v. Kozminski*, 487 U.S. 931 (1988). Def. Mem. at 5–6. Plaintiffs respond that the TVPA

expanded the definition of trafficking beyond *Kozminski*, §§ 1589 and 1584 claims have been analyzed together since TVPA was enacted, and, in any event, they alleged sufficient psychological harm for an involuntary servitude claim.  Pl. Mem. at 8–11, 12–17.

In *Kozminski*, the Supreme Court interpreted a version of § 1584 that matches the current statutory text in all relevant ways.[4]    487 U.S. at 944.   *Kozminski* explains that "the term 'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process."   *Id.* at 952.   In "determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve," the "special vulnerabilities" of a victim are relevant.  *Id.*  The *Kozminski* Court explicitly rejected a reading of the statute that prohibits psychological coercion or "threat[s that] seriously affect[ a worker's] future welfare but as to which he still has a choice, however painful." *Id.* at 949–50 (quoting *United States v. Shackney*, 333 F.2d 475, 487 (2d Cir. 1964)).

Although Congress intended for the TVPA (and by extension the TVPRA) to expand the scope of prohibited conduct, Congress accomplished this by enacting the prohibition on forced labor in § 1589.  *See Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 437 (E.D.N.Y. 2017).  In contrast, Congress did not change § 1584 or the conduct it prohibits.

Here, Plaintiffs allege that Defendants "coerced Plaintiffs into involuntary servitude by orchestrating . . . financial dependence on and debt." AC ¶ 101.  Even considered with the allegations of unpredictable and arbitrary pay and physical isolation, this does not establish

---

[4] *Compare Kozminski*, 487 U.S. at 944 ("knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude any other person for any term") *with* current text of 18 U.S.C. § 1584 ("knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude[] any other person for any term").

involuntary servitude.  Plaintiffs did not allege that they were physically restrained, abused, or threatened with physical abuse.  Plaintiffs also did not specifically refer to Trejos's implicit threats for this claim.  Even if they had, however, that allegation would not be sufficient to allege involuntary servitude because any reasonable inference from those threats would be related to collection of debts from Plaintiffs.  Although that would affect Plaintiffs' "future welfare," they would still have "a choice, however painful."  *See Kozminski*, 487 U.S. at 950.  Therefore, the Amended Complaint does not state a claim for involuntary servitude, and Defendants' motion is granted as to this basis of the TVPRA claim.

### 3.    Peonage in Violation of 18 U.S.C. § 1581

Plaintiffs also allege that they were held "in a condition of peonage" as Defendants compell[ed] Plaintiffs to work for Defendants to pay off their purported debt" in violation of 18 U.S.C. § 1581.  AC ¶ 100.  Defendants argue, among other things, that this claim should be dismissed because peonage claims are a type of involuntary servitude claim.  Def. Mem. at 10. Plaintiffs respond that peonage is a separate, sufficient cause of action under the TVPRA and argue that *United States v. Sabhnani*, 599 F.3d 215, 243 (2d Cir. 2010) supports their position that a debt scheme that keeps victims indigent and dependent is sufficient to allege peonage.  Pl. Mem. at 8, 11–12.

The relevant statute, 18 U.S.C. § 1581, prohibits "hold[ing] . . . any person to a condition of peonage."  The Second Circuit has defined peonage as "compulsory service in payment of a debt that can be real or artificially created."  *Sabhnani*, 599 F.3d at 243 (citing *Bailey v. Alabama*, 219 U.S. 219, 242 (1911)).  This definition requires that the victim be in a position of involuntary servitude.  *United States v. Shackney*, 333 F.2d 475, 481 (2d Cir. 1964) (noting that "any case that could be reached under [§ 1581] could also be reached under [§ 1584]); *Bailey*, 219 U.S. at 227 (striking down a state statute that "enforce[s] involuntary servitude by compelling personal service

in liquidation of a debt" because it violated the federal ban on peonage); *see also* 2 Leonard Sand,

John S. Siffert, Walter P. Loughlin, & Steven A. Reiss, Modern Federal Jury Instructions-Criminal

§ 47A.01 comment to Form Instr. 47A-6 (2025).

Given that Plaintiffs have not stated a claim for involuntary servitude, they also have not

stated a claim for peonage, and Defendants' motion as to this basis of the TVPRA claim is granted.

### 4.    Labor Trafficking in Violation of 18 U.S.C. § 1590

Defendants also challenge Plaintiffs' labor trafficking claim because Plaintiffs have failed

to state a claim for a predicate violation.  Def. Mem. at 11.  18 U.S.C. § 1590 provides liability for

anyone who "knowingly . . . harbors, transports, . . . or obtains by any means[] any person for labor

or services in violation of  [18 U.S.C. §§1581 through 1597].

"[I]f a defendant violates [§]1589, he also violates [§] 1590," so long as the defendant

obtains the victim's forced labor.  *See Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir.

2019).  Given that Plaintiffs' forced labor claim in violation of § 1589 survives, this challenge

fails.

### C.    Labor Trafficking in Violation of New York Penal Law § 135.35

Finally, Defendants challenge Plaintiffs' claim that Defendants committed labor trafficking

under New York law because New York labor trafficking requires compelled labor like that

required for a federal peonage claim.  Def. Mem. at 11–13.  Plaintiffs respond, among other

arguments, that they have adequately alleged a debt scheme that is sufficient under New York law,

and that the cases that Defendants rely on are distinguishable.  Pl. Mem. at 17–19.

New York Social Services Law § 483-bb(c)(i) provides that one "who is a victim of the

conduct prohibited by [New York Penal Law § 135.35] may bring a civil action against the

perpetrator."  New York Penal Law § 135.35 criminalizes "labor trafficking" by "compel[ling] or

induc[ing] another to engage in labor . . . by means of intentionally . . . requiring that the labor be

performed to retire, repay, or service a real or purported debt that the actor has caused by a systematic ongoing course of conduct with intent to defraud such person."

Plaintiffs' allegations are sufficient under the plain text of the statute. They allege that (1) Defendants induced them to work to repay a real or purported debt that Defendants caused through an ongoing, fraudulent course of conduct; (2) Defendants did not tell them about the substantial debt until they were in the United States or tell them how their wages were applied to the debt allowing a reasonable inference that their debt was fraudulent; (3) Defendants told at least one Plaintiff that he could not leave until he finished working for Defendants allowing a reasonable inference that the only way Plaintiffs could pay their debt was through their labor; and (3) Defendants repeatedly deducted wages, to repay the debt without authorization. Viewing these allegations as true, they are sufficient at this stage of the litigation to demonstrate a systemic, ongoing course of conduct.

Defendants rely on district court cases, but those decisions do not bind this Court, and they are distinguishable. In *Ross v. Jenkins*, 325 F. Supp. 3d 1141 (D. Kan. 2018), the district court concluded that forcing a minor to work without pay by using physical violence, withholding necessities, and imposing isolation is sufficient to make out a New York labor trafficking claim, but that does not mean that those allegations are the minimum required by the statute. *Id.* at 1159–60, 1166. In *Ngono v. Owono*, No. 21-cv-95, 2022 WL 18959568 (S.D.N.Y. Aug. 22, 2022), the district court concluded that a plaintiff who did not allege that he was compelled or induced to work to service a voluntarily assumed debt failed to state a claim under this statute. *Id.* at *3. Here, however, Plaintiffs have alleged that they were induced to work to pay a debt where, viewing the allegations as true, at this stage of the litigation, it could be reasonably inferred that they did not voluntarily assume or service that debt.

Accordingly, the Amended Complaint states a claim for New York labor trafficking, and Defendants' motion is therefore denied as to this claim.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss the Amended Complaint, Dkt. No. 27, is **DENIED IN PART** and **GRANTED IN PART**; and it is further

**ORDERED** that Defendants' motion to dismiss is **GRANTED** as to Plaintiffs' TVPRA cause of action to the extent that it is based on claims of involuntary servitude and peonage in violation of 18 U.S.C. §§ 1581 and 1584; and it is further

**ORDERED** that Defendants' motion to dismiss is **DENIED** in all other respects.

**IT IS SO ORDERED.**

Dated: September 16, 2025

Elizabeth C. Coombe
U.S. District Judge